IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:14-CV-00039-FL

**Robert Cartwright** &
**Jonathan Sawyer, III**,

     Plaintiffs,

v.

**Town of Plymouth**; **Kenneth Creque**, in his personal capacity; and **Joanne Floyd**, in her official capacity,

     Defendants.

**Memorandum and Recommendation on Motion to Dismiss by Defendants Floyd and Town of Plymouth**

   Plaintiffs Robert Cartwright and Jonathan Sawyer, III[1] initiated this action on June 29, 2014 by filing a Complaint against the Town of Plymouth; Joanne Floyd, in her official capacity as Town Manager; and Kenneth Creque, in his personal capacity as former Town Manager. (D.E. 1.)  In its original form, the Complaint asserted a variety of constitutional, statutory, and common law claims against the Defendants.  Specifically, Plaintiffs asserted that Defendants violated (1) their First Amendment right to freedom of speech; (2) their First Amendment right to petition the government for the redress of grievances; and (3) their Fourteenth Amendment right to the equal protection of the laws. (D.E. 1; Compl. at ¶¶ 76-90.) They also alleged that Defendants failed to pay them for compensable time in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-19. (*Id.* at ¶¶ 97-101.)  Finally, they claimed that the Town was liable for wrongful discharge in violation of public policy under North Carolina law. (*Id.* at ¶¶ 91-96.)

---

[1] Plaintiffs' counsel notified the court on December 29, 2014 that Sawyer passed away on November 24, 2014. (D.E. 42).  Concurrently, Plaintiffs' counsel moved to substitute Denise O. Sawyer, Sawyer's widow and the Administratrix of his estate, as a party to this action. (D.E. 43.)  As the time for Plaintiffs' to file a reply brief has not expired yet, this motion is not ripe for resolution at this time.

1

However, since the filing of the initial Complaint, Plaintiffs have narrowed the claims they wish to pursue. On August 18, 2014, prior to the Defendants responding to the Complaint, Plaintiffs voluntarily dismissed their FLSA claim. (D.E. 13.) Additionally, after Floyd and the Town filed their Motion to Dismiss, Cartwright stated that he no longer wished to pursue his equal protection claim. (D.E. 31; Pl. Resp. at 9.).

Floyd and the Town have requested that the court dismiss Plaintiffs' claims against them.[2] (D.E. 16.) They argue that Plaintiffs constitutional claims must be dismissed because the Complaint does not allege that the constitutional injuries were the result of a Town policy or custom. The Town also asserts that the Plaintiffs' wrongful discharge claim must be dismissed after the court has dispensed with the constitutional claims. Although Plaintiffs do not make a serious attempt to salvage their constitutional claims against Floyd and the Town, they contend that they have stated a claim for wrongful discharge in violation of public policy because their terminations violated their federal constitutional rights.

After reviewing the pleadings, the arguments presented by the parties, and the relevant case law, it appears that Plaintiffs' claims against Floyd and the Town contain several deficiencies which require their dismissal. Plaintiffs' constitutional claims fail because there is no allegation that the constitutional violations were the result of the Town's policy or custom. Plaintiffs cannot maintain a wrongful discharge claim because, even if their federal claims moved forward, it does not appear that the Supreme Court of North Carolina would allow a claim of wrongful discharge in violation of public policy to be based upon a violation of federal

---

[2] Creque filed a separate Motion to Dismiss, well after Floyd and the Town. (D.E. 38.) The parties have only recently completed briefing related to Creque's Motion and it is still pending before the court.

constitutional law. Therefore, it is recommended[3] that the court grant Floyd and the Town's Motions to Dismiss.

I.      **Overview of Factual Allegations**

   **A. Factual Allegations Relevant to Cartwright's Termination**

On April 14, 2012, Cartwright was involved in two investigations: one involving a female subject detained by a Tyrell County deputy sheriff for allegedly stealing property from a business within the Town's jurisdiction and a breaking and entering ("B&E") at a Town residence. (*Id.* at ¶¶ 9-14.) In the first investigation, Cartwright did not arrest the female subject. He allowed her to remain in the custody of the deputy sheriff who then charged her with possession of stolen goods and transported her to jail. (*Id.* at ¶¶ 11-12.)

In the second investigation, Cartwright responded to the B&E call with his partner, Officer Muhammad. Officer Muhammad apprehended the alleged perpetrator of the crime several hours later, but Cartwright transported the suspect to the police department. (*Id.* at ¶¶ 14-16.) Officer Muhammad filed the police report on the B&E incident in the computerized reporting system ("Police-Pak"). (*Id.* at ¶ 19.)

When writing the Police-Pak report, Officer Muhammad mistakenly transposed the names of the victims and witnesses. (*Id.*) Later that morning, when both Cartwright and Muahmmad were headed home after their shifts, Captain Williams of the Town police department called Cartwright and told him "that either [he] or Muhammad need[ed] to return to the [police department] to correct the B&E report." (*Id.* at ¶ 27.) Cartwright attempted to get Muhammad to return to the department to correct the report, but was unable to reach him. (*Id.* at ¶ 28.)

---

[3] The court referred this matter for entry of a Memorandum and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

Cartwright then called Investigator Peal, another officer in the police department, and Sawyer, who was Cartwright's immediate supervisor but who was home on leave at the time, to "express unhappiness with the idea he would have to return to [the police department]" and confirm what he regarded as standard practice with respect to correcting such reports. (*Id.* at ¶¶ 29-31.) Sawyer agreed to correct the Police-Pak report on Cartwright's behalf. (*Id.* at ¶¶ 35, 37.)

Cartwright did not return to the police department. Rather, he called Investigator Peal to state that Sawyer had corrected the report. (*Id.* at ¶ 38.) Peal then stated that Officer Muhammad would need to return to the department. (*Id.* at ¶ 40.) Cartwright did not speak to Captain Williams, but concluded that the captain rescinded his original directive to return to the department because Peal, who was in Captain Williams's presence, said that only Muhammad needed to return. (*Id.* at ¶ 43.) Cartwright did not believe that his failure to return to the police department as directed by Captain Williams was insubordination "as it was not the declination of a request or command as the result of a positive intention to disobey." (*Id.* at ¶ 45.) He suggests in the Complaint that this belief was consistent with the Town's employment policy, which defines "insubordination" as a "[r]efusal to accept a reasonable and proper assignment from and authorized superior." (*Id.*)

On April 23, 2012, Captain Williams notified Cartwright that he would be suspended for two days without pay. (*Id.* at ¶ 46.) Williams provided four grounds for this suspension: a) inaccurate information entered into the B&E incident report; b) failure to follow the chain of command by contacting Sawyer, who was home on medical leave, rather than other members of the chain; c) insubordination for failure to obey Captain Williams's order to return to the police department to correct the mistaken report; and d) mishandling the investigation of the female

4

subject who allegedly stole property by failing to contact the business owners and make an arrest. (*Id.*)

Cartwright appealed his suspension to the then-Town Manager, Defendant Creque, on April 23, 2012. (*Id.* at ¶ 47.) Creque initially denied Cartwright's appeal by letter dated May 10, 2012. In that letter, he upheld all of the allegations of misconduct presented by Captain Williams. (*Id.*) Cartwright then requested a hearing on the matter, which Creque granted on May 18, 2012.

After the hearing, Creque upheld the suspension and took the additional action of terminating Cartwright's employment. (*Id.* at ¶ 52.) In his findings in support of his decision, Creque determined that Cartwright had not failed to complete incident documents, to follow the chain of command, or to make an arrest in contravention of departmental policy. Creque found that Cartwright had, however, admitted to willfully refusing to follow a directive from Captain Williams and to threatening to resign during the dispute. (*Id.* at ¶ 50.) He also found that Cartwright refused a directive from his appointed supervisor Investigator Peal. (*Id.*)

The Town's grievance policy governing disputes between employees provides: "Employees subject to this Article shall have the opportunity to be heard without fear of reprisal or retaliation . . . ." (*Id.* at ¶ 51.)

### B. Factual Allegations Relevant to Sawyer's Termination

After a period of medical leave, Sawyer sought to return to work with the police department on April 23, 2012 but did not submit the required medical release form. (*Id.* at ¶ 54.) He spent several days negotiating with Captain Williams and the Town's human resources representative about the proper procedure before Williams ordered Sawyer to return to work on April 27, 2012. (*Id.* at ¶¶ 54-56.)

5

On May 16, 2012, Sawyer attended a meeting with Williams, Chief Steve O'Neal ("Chief O'Neal"), and Creque during which he discussed the dispute over the medical release form. During this meeting, Creque stated that Sawyer had been reported as working for his wife's company in potential violation of the Town's outside employment policy. (*Id.* at ¶ 58.) Sawyer replied that he received no compensation for his work at his wife's business. (*Id.*) Creque then demanded that Sawyer submit a written request to be able to continue his work in his wife's business, which Sawyer did. (*Id.* at ¶ 59.)

On June 3, 2012, before receiving a reply to his request to continue outside employment, Sawyer was asked by Investigator Peal if he would do a job for a local wrecker company which needed someone to fill-in at the scene of an accident. (*Id.* at ¶ 60.) Sawyer, who had previously worked for a wrecker company, took the job right away. While he was at the scene, Sawyer was photographed by Jennifer O'Neal (the wife of Chief O'Neal), who worked for a competing wrecker company. Ms. O'Neal gave the pictures to Chief O'Neal. (*Id.* at ¶ 61.)

On June 8, 2012, Sawyer received a letter from Creque granting him permission to continue his work with his wife's business under the condition that Sawyer work there only while he was off duty with the police department; that he stay away from the business during duty hours for any reason other than official police business; and that he not "work for, or provide favours [sic] for, friends, or family with their businesses, under any circumstances." (*Id.* at ¶ 62.)

Sawyer contends that other employees with the Town police department had outside employment ranging from working for a funeral home or a gutter business to cleaning cottages at the beach for a realty company. (*Id.* at ¶ 71.) He contends further that these employees were not required to get permission for such employment nor disciplined for having it. (*Id.*)

6

After receiving the June 8 letter from Creque, Sawyer approached Town Councilperson Mary Nixon ("Nixon") and showed her the letter from Creque. (*Id.* at ¶ 63.) Sawyer then presented her with two alternate versions of the Town's outside employment policy that he had drafted. (*Id.*)

On June 21, 2012, Chief O'Neal suspended Sawyer for four days until a pre-disciplinary hearing that would be held on June 25. (*Id.* at ¶ 65.) Chief O'Neal cited four violations of Town policy at this meeting. (*Id.*) Sawyer was charged with: (1) one count of working at an unreported job, which Sawyer understood to refer to his work for the wrecker company; (2) one count of transmitting confidential information, which Sawyer understood to refer to his entry of a correction to Officer Muhammad's Police-Pak report discussed above; (3) one count of employee harassment, which Sawyer understood to refer to Creque's perception that Sawyer's discussion with Nixon was an effort to coerce Creque into changing his position expressed in the letter from June 8; and (4) two counts of insubordination, which Sawyer understood to refer to violations of Creque's "announcement that Town employees were not permitted to talk to Town councilmembers concerning any administrative policy or policies." (*Id.* at ¶ 67.)

At a meeting on July 20, 2012, Creque and Chief O'Neal terminated Sawyer from his employment with the Town police department. (*Id.* at ¶ 70.)

## II. Legal Standard

Floyd and the Town have filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rule of Civil Procedure. The pleading standard set forth in Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," and a complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

7

556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); *see also Robinson v. Am. Honda Motor Co., Inc.,* 551 F.3d 218, 222 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When reviewing the sufficiency of the complaint, the court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Philips v. Pitt County Mem'l Hosp.,* 572 F.3d 176, 180 (4th Cir. 2009).

Under this standard, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. Thus, while "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' ... it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly,* 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show [n]'—'that the pleader is entitled to relief,' as required by Rule 8...." *Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal,* 556 U.S. at 678). Accordingly, "Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* (quoting *Iqbal,* 556 U.S. at 678–79).

### III. Section 1983 Claims against Floyd and the Town

Plaintiffs' Section 1983 claims against the Town and Floyd should be dismissed because they fail to allege even the most basic aspects of a constitutional claim against a local government and an official sued in their official capacity. For decades, it has been well established that a plaintiff may only prevail on these types of claims if he can establish that the constitutional injury resulted from an official policy or custom of the governmental entity named

in the complaint. *McMillian v. Monroe Cnty.*, 520 U.S. 781, 784–85, (1997); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *Love–Lane v. Martin*, 355 F.3d 766, 782–83 (4th Cir.2004). Neither Plaintiffs' Complaint, nor their response to the Motion to Dismiss argues that any of the alleged constitutional violation were attributable to a Town policy or custom.

In fact, Plaintiffs' Complaint suggests in several places that the conduct at issue was *contrary* to Town policy, not a product of it. They suggest that Creque's decision to terminate Cartwright was contrary to the Town's grievance policy and contrary to the Town's policy definition of insubordination. (D.E. 1; Compl. at ¶¶ 45, 51-52.) They state that Creque required Sawyer to submit a written request to continue outside employment and suggest that this request was outside the scope of the Town's policy with respect to uncompensated work, but they do not allege that this additional requirement proximately caused the deprivation of one of Sawyer's rights. (*Id.* at ¶ 58.) They state passingly that Sawyer was disciplined for violating Creque's alleged "announcement" that Town employees were not permitted to discuss administrative policies with Town councilmembers. (*Id.* at ¶ 67.) They provide no facts, however, to suggest that this "announcement" was attributable to the Town or that it constituted a policy or custom.

The factual allegations in the Complaint fail to show that the alleged constitutional violations were the result of an official policy or custom of the Town of Plymouth. Therefore, it is recommended that Plaintiffs' constitutional claims against Floyd and the Town be dismissed.

**IV.     Wrongful Discharge Claim against the Town**

Cartwright and Sawyer assert their claim of Wrongful Discharge in Violation of Public Policy against the Town only. (D.E. 1; Claim IV.) North Carolina's common law cause of action for wrongful discharge is a limited exception to the State's general "employment-at-will"

9

doctrine. *Salter v. E & J Healthcare, Inc.*, 155 N.C. App. 685, 692, 575 S.E.2d 46, 51 (2003). To establish a wrongful discharge claim, a plaintiff must "identify a specified North Carolina public policy that was violated by an employer in discharging the employee." *Id.* at 694, 575 S.E.2d at 52.

Cartwright and Sawyer do not identify any specific North Carolina public policy that the Town violated when it terminated their employment. Instead, they claim simply that the Town violated North Carolina public policy by violating their First Amendment rights and the right to the equal protection of the laws under the Fourteenth Amendment. (D.E. 31; Pl. Resp. at 11.) This court has been skeptical of attempts to base a North Carolina common law wrongful discharge claim on alleged violations of federal law. *See Warren v. Smithfield Packing Co., Inc.*, Case No. 5:14-cv-71, 2014 WL 1691513, *1 (E.D.N.C. Apr. 29, 2014) (citing cases). After reviewing the relevant case law from the North Carolina Supreme Court, it appears that the North Carolina Supreme Court would require a wrongful discharge claim to be based upon "a specific North Carolina Statute or a specific provision in the North Carolina Constitution in order to state a claim." *Id.* at *2. Plaintiffs' failure to identify such a statutory or constitutional provision in their Complaint means that their claim fails as a matter of law. Therefore, it is recommended that the court dismiss Plaintiffs' wrongful discharge claim.

V. Conclusion

In light of their failure to allege that the constitutional violations involved in this case were the result of an official policy or custom of the Town of Plymouth, it is recommended that Plaintiffs' claims against the Floyd and the Town be dismissed. Additionally, it is recommended that the Plaintiffs' wrongful discharge claim against the Town be dismissed because Plaintiffs

failed to identify a North Carolina statutory or constitutional provision that was violated by their termination.

Dated: February 6, 2015

*Robert T. Numbers II*
ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE