IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:14-CV-00039-FL

Robert Cartwright and
Denise O. Sawyer, Administratrix of the
Estate of Jonathan Sawyer, III,

        Plaintiffs,

v.

Town of Plymouth; Kenneth
Creque, in his personal capacity; and
Joanne Floyd, in her official capacity,

        Defendants.

**Memorandum & Recommendation on
Motion to Dismiss by Defendant Creque**

Defendant Kenneth Creque, who is sued in his individual capacity, requests that the Court dismiss the Complaint filed against him by Plaintiffs Robert Cartwright and Jonathan Sawyer, III[1] on the ground that it fails to state a claim upon which relief may be granted.[2] D.E. 38. Plaintiffs allege that Creque violated their rights under the First Amendment by terminating them in retaliation for engaging in protected speech and petitioning the government for redress of grievances. Sawyer also claims that Creque violated his Fourteenth Amendment right to equal protection under the law due to his selective application of a Town of Plymouth policy barring outside employment for police department personnel.[3] Creque argues that Plaintiffs' Complaint fails to establish the necessary elements of their constitutional claims and, in any event, he is entitled to qualified immunity.

---

[1] On March 17, 2015, the court granted Plaintiffs' Motion to Substitute original plaintiff Jonathan Sawyer, III, who died November 24, 2014, with his wife, Denise O. Sawyer, as administratrix of the estate of Jonathan Sawyer, III.

[2] The Court previously dismissed Plaintiffs claims against the Town of Plymouth and Joanne Floyd. D.E. 53.

[3] Initially, both Plaintiffs raised an equal protection claim. However, Cartwright subsequently abandoned his claim. Pl. Resp. at 1, D.E. 44.

1

After reviewing the Complaint, the parties' arguments, and the relevant case law, the undersigned concludes that Plaintiffs' claims against Creque should be dismissed. Plaintiffs' freedom of speech claims fail because their speech addressed private employment grievances instead of matters of public concern. Their claims under the Petition Clause fail for a similar reason. Furthermore, Sawyer cannot maintain his "class of one" equal protection claim because such claims are not recognized in the public employment context. Therefore, the undersigned recommends[4] that the court grant Creque's Motion to Dismiss.

I.      **Factual Allegations**

**A. Factual Allegations Relevant to Cartwright's Termination**

On April 14, 2012, Cartwright, an officer with the Plymouth police department, was involved in two investigations: one involving a theft from a business and another for a breaking and entering ("B&E") at a Plymouth residence. *Id.* ¶¶ 9-14. For various reasons, Cartwright did not arrest the suspect in the first incident. *Id.* ¶¶ 11-12. After the B&E investigation, Cartwright's partner, Officer Muhammad, filed a report on the incident in the department's computerized reporting system ("Police-Pak"). *Id.* ¶ 19.

When Officer Muhammad composed the B&E Police-Pak report, he mistakenly entered incorrect information. *Id.* Later that morning, when both Cartwright and Muhammad were headed home, Captain Williams of the Plymouth police department called Cartwright and told him "that either [he] or Muhammad need[ed] to return to the [police department] to correct the B&E report." *Id.* ¶ 27. Cartwright attempted to get Muhammad to return to the department to correct the report, but was unable to reach him. *Id.* ¶ 28.

---

[4] The court referred this matter for entry of a Memorandum and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

2

Cartwright then called Investigator Peal, another officer in the police department, and Sawyer, who was Cartwright's immediate supervisor but who was home on leave at the time, to "express unhappiness with the idea he would have to return to [the police department]" and confirm what he regarded as standard practice with respect to correcting such reports. *Id.* ¶¶ 29-31. Sawyer agreed to correct the Police-Pak report on Cartwright's behalf. *Id.* ¶¶ 35, 37.

Cartwright did not return to the police department. *See id.* ¶¶ 42-44. Rather, he called Investigator Peal to state that Sawyer had corrected the report. *Id.* ¶ 38. Peal then stated that Officer Muhammad would need to return to the department. *Id.* ¶ 40. Cartwright did not speak to Captain Williams, but concluded that the captain rescinded his original directive to return to the department because Peal, who was in Captain Williams's presence, said that only Muhammad needed to return. *Id.* ¶ 43. Cartwright did not believe that his failure to return to the police department as directed by Captain Williams was insubordination "as it was not the declination of a request or command as the result of a positive intention to disobey." *Id.* ¶ 45. He suggests in the Complaint that this belief was consistent with Plymouth's employment policy, which defines "insubordination" as a "[r]efusal to accept a reasonable and proper assignment from and authorized superior." *Id.*

On April 23, 2012, Captain Williams notified Cartwright that he would be suspended for two days without pay. *Id.* ¶ 46. Williams provided four grounds for this suspension: (a) inaccurate information entered into the B&E incident report; (b) failure to follow the chain of command by contacting Sawyer, who was home on medical leave, rather than other members of the chain; (c) insubordination for failure to obey Captain Williams's order to return to the police department to correct the mistaken report; and (d) mishandling the business theft investigation. *Id.*

Cartwright appealed his suspension to Creque, who was at that time Town Manager, on April 23, 2012. *Id.* ¶ 47. Creque initially denied Cartwright's appeal by letter dated May 10, 2012. In that letter, he upheld all of the allegations of misconduct presented by Captain Williams. *Id.* Cartwright, acting through counsel, then requested a hearing on the matter, which Creque granted by an email to Cartwright's counsel on May 18, 2012. *Id.* ¶ 49.

After the hearing,[5] Creque absolved Cartwright of failing to complete incident documents, failing to follow the chain of command, and failing to make an arrest in contravention of departmental policy. However, Creque found that Cartwright admitted to willfully refusing to follow a directive from Captain Williams and threatening to resign during the dispute. *Id.* ¶ 50. He also found that Cartwright refused a directive from his appointed supervisor, Investigator Peal. *Id.* Based upon these findings, Creque upheld Cartwright's suspension and took the additional action of terminating his employment. *Id.* ¶ 52. Cartwright claims that he was terminated in retaliation for challenging the discipline initially imposed by Captain Williams. *See id.* ¶ 83.

### B. Factual Allegations Relevant to Sawyer's Termination

On May 16, 2012, Sawyer attended a meeting with Williams, Chief Steve O'Neal, and Creque. During this meeting, Creque stated that he received a report that Sawyer was working for his wife's business, an act which potentially violated Plymouth's policy limiting outside employment. *Id.* ¶ 58. Sawyer acknowledged that he worked in his wife's store, but claimed that he received no compensation. *Id.* Creque then demanded that Sawyer submit a written request to be able to continue his work in his wife's business, which Sawyer did. *Id.* ¶ 59.

---

[5] The Complaint does not state when the hearing occurred or if Cartwright was represented by counsel during the hearing.

On June 3, 2012, before receiving a reply to his request to continue his outside employment, Investigator Peal asked Sawyer if he would assist a local wrecker company that needed someone to fill-in at the scene of an accident. *Id.* ¶ 60. Sawyer, who had previously worked for a wrecker company, took the job right away. *Id.* ¶ 61. While he was at the scene, Jennifer O'Neal (the wife of Chief O'Neal), who worked for a competing wrecker company, photographed Sawyer operating the wrecker. Ms. O'Neal gave the pictures to Chief O'Neal. *Id.* ¶ 61.

On June 8, 2012, Sawyer received a letter from Creque granting him permission to continue working with his wife's business under the following conditions: (1) Sawyer could only work there while he was off duty; (2) he was to stay away from the business while on duty unless he was conducting official police business; and (3) he was not to "work for, or provide favours [sic] for, friends, or family with their businesses, under any circumstances." *Id.* ¶ 62.

Sawyer contends that other Plymouth police department employees had outside employment ranging from working for a funeral home or a gutter business to cleaning cottages at the beach for a realty company. *Id.* ¶ 71. He further contends that these employees were not required to get permission for such employment and were not disciplined for working outside the police department. *Id.*

After receiving Creque's letter, Sawyer approached Plymouth Councilperson Mary Nixon to discuss the letter's terms. *Id.* ¶ 63. During this conversation, Sawyer presented Nixon with two alternate versions of Plymouth's outside employment policy that he had drafted. *Id.* He claims that he wanted to encourage Nixon "at some point in the future . . . to amend the outside employment policy for the benefit of all Town employees." *Id.* On June 20, 2012, eight days

after his initial conversation, Sawyer followed-up with Nixon by phone "because [he] had not heard anything from Creque." *Id.* ¶ 64.

On June 21, 2012, Chief O'Neal notified Sawyer that he would be suspended until a June 25, 2012 pre-disciplinary hearing. *Id.* ¶ 65. At the hearing, Chief O'Neal charged Sawyer with four violations of Town policy: (1) one count of working at an unreported job, which Sawyer understood to refer to his work for the wrecker company; (2) one count of transmitting confidential information, which Sawyer understood to refer to his correction of Officer Muhammad's Police-Pak report; (3) one count of employee harassment, which Sawyer understood to refer to Creque's perception that Sawyer's discussion with Nixon was an effort to coerce Creque into changing his position expressed in the June 8 letter; and (4) two counts of insubordination, which Sawyer understood to refer to violations of Creque's "announcement that Town employees were not permitted to talk to Town councilmembers concerning any administrative policy or policies." *Id.* ¶¶ 65, 67.

Approximately one month later, Creque and Chief O'Neal terminated Sawyer from his position with Plymouth's police department. *Id.* ¶ 70. Sawyer claims he was terminated in retaliation for speaking with Nixon about his concerns over the outside employment policy. *Id.* ¶ 83.

## II.    Analysis

Creque's Motion to Dismiss argues that the Complaint should be dismissed because it fails to state a claim upon which relief may be granted. The Supreme Court explained that in order to withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court explained that "[a] claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Therefore, while a court must accept all the factual allegations contained in a complaint as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.*

After *Iqbal*, a court considering a motion under Rule 12(b)(6) must subject a complaint to a two-part test. First, the court must identify the allegations in the complaint that are not entitled to the assumption of truth because they are conclusory in nature or nothing more than a formulaic recitation of the elements of a claim. *Id.* at 679. Then, taking the remaining factual allegations as true, the court must determine whether the complaint "plausibly suggest[s] an entitlement to relief." *Id.* If, after conducting this two-part analysis, "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'shown' — 'that the pleader is entitled to relief'" *Id.* If a party fails to show that they are entitled to relief, the court must dismiss the deficient claims.

Here, Plaintiffs' claims arise under 42 U.S.C. § 1983, which states: "Every person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983. To succeed on a claim under Section 1983 against a government official in his individual capacity, a plaintiff must establish two essential elements: (1) that the defendant acted under color of state law, and (2) that the plaintiff suffered the deprivation of a constitutional right as a result of that action. *See, e.g., Gomez v. Toledo,* 446 U.S. 635 (1980).

With this framework in mind, the court turns to its evaluation of Plaintiffs' claims.

### A.     First Amendment Retaliation as a Result of Free Speech

Plaintiffs argue that Creque terminated them in retaliation for their acts of protected speech. Compl. ¶ 78, D.E. 1. Cartwright contends that he was terminated in retaliation for speaking out against what he regarded as the "baseless allegations" supporting his two-day suspension. Pl. Resp. at 4-5, D.E. 44. Sawyer contends that he was terminated in retaliation for speaking to a town councilperson about the outside employment policy under which he had been disciplined. *Id.* at 7.

To advance a § 1983 First Amendment retaliation claim, a plaintiff must establish three elements: (1) that his or her speech was protected; (2) that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech; and (3) that a causal relationship exists between its speech and the defendant's retaliatory action. *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685-86 (4th Cir. 2000). To establish that a public employee's speech was protected by the First Amendment, the plaintiff must show that his speech that formed the basis for the alleged retaliatory action was related to a matter of public concern. *See Connick v. Myers,* 461 U.S. 138, 146. "To determine whether speech involves a matter of public concern, [the court] examines the content, form, and context of the speech at issue in light of the entire record." *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004).

Furthermore, "it is settled that a public employee's expression of grievances concerning his own employment is not a matter of public concern." *Huang v. Bd. of Governors of Univ. of N. Carolina*, 902 F.2d 1134, 1140 (4th Cir. 1990). The First Amendment's protections do not extend to "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest . . . ." *Stroman v. Colleton Cnty. Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992).

If the court determines that an employee's speech was related to a matter of public concern, it must then balance the employee's interest "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *See Connick*, 461 U.S. at 142 (internal quotation marks omitted). Finally, the requirement of a causal connection between the expression of public concern and the retaliatory action is rigorous; a plaintiff "must show that 'but for' the protected expression the employer would not have taken the alleged retaliatory action." *Huang*, 902 F.2d at 1140.

### 1. Cartwright

Cartwright argues generally that Creque retaliated against him for his speech in his April 23, 2012 written response to his two–day suspension and his speech at the hearing on this suspension. Pl. Resp. at 4-5. D.E. 44. His Complaint, however, provides few specific allegations about his speech on those occasions. Cartwright alleges in the Complaint only that he (1) appealed his two-day suspension and requested, through counsel, a hearing (*id.* ¶¶ 47, 49); (2) discussed with Creque the reasons for his suspension (*see id.* ¶ 50); and (3) admitted to Creque that he willfully disobeyed two orders from his superiors and threatened to resign during his earlier dispute with them (*id.* ¶ 50). Creque argues that Cartwright's First Amendment retaliation claim should be dismissed because his statements were not about matters of public concern. Def. Mem. in Supp. at 15-16, D.E. 17.[6]

The content, form, and context of Creque's statements demonstrate that they were private employment grievances instead of comments about matters of public concern. *See Huang*, 902 F.2d at 1140. Just like many other employees confronted with accusations of misconduct with

---

[6] Defendant incorporates by reference (D.E. 39 at 6) arguments from his counsel's Memorandum in Support of Plymouth and Floyd's Motion to Dismiss (D.E. 17).

which they disagree, Cartwright complained of the reasons for his suspension and demanded a hearing to discuss them. Compl. ¶¶ 47-49, D.E. 1. His complaints were narrowly concerned with whether he disobeyed orders or committed other infractions. He thought the accusations against him were "baseless," but that does not mean that he was addressing a public concern. Whether or not Cartwright acted in accordance with department policy "is not of sufficient significance to attract public interest" and Cartwright was clearly not seeking to advance public debate on the merits of the discipline imposed by his superiors. *See Kirby*, 388 F.3d at 447. For these reasons, Cartwright's statements about his employment grievance were private concerns for the purposes of the First Amendment.

Cartwright attempts to render his speech activity a matter of public concern by citing *Kirby v. City of Elizabeth City*, 388 F.3d 440 (4th Cir. 2004)[7] and *Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009). Neither case helps his argument. In *Kirby*, the Court of Appeals upheld the district court's grant of summary judgment against a police officer's claim that his testimony in a public hearing on another officer's misconduct was a matter of public concern. 388 F.3d at 446-47. The court upheld the lower court's ruling because the officer's testimony concerned whether another officer had maintained his vehicle according to department policy. *Id.* at 447. Such testimony, according to the court, was not a matter of public concern. *Id.*

Similar to the officer's testimony in *Kirby*, Cartwright's statements in his own defense against charges of misconduct were not in any way oriented toward furthering public debate on a public issue. According to the Complaint, Cartwright spoke out against his suspension for insubordination and other misconduct. Compl. ¶¶ 47-49, D.E. 1. Regardless of whether Creque

---

[7] Plaintiff's Response to Creque's Motion (D.E. 44) cites *Kirby*, 380 F.3d 777 (4th Cir. 2004) for support. The Fourth Circuit superseded that opinion after a rehearing on the matter. *See Kirby v. City of Elizabeth City*, 388 F.3d 440 (4th Cir. 2004). This memorandum and recommendation will cite the Fourth Circuit's standing precedent, *Kirby v. City of Elizabeth City*, 388 F.3d 440 (4th Cir. 2004).

was mistaken about Cartwright's conduct, the content of the dispute between the two men was not an issue bearing on the "social, political, or general well-being of the community." *Edwards*, 178 F.3d at 246-47.

In *Andrew*, the Fourth Circuit reversed the district court's dismissal of a police officer's § 1983 First Amendment retaliation claim by holding that the officer's unauthorized act of leaking information to a major newspaper about an investigation into a police-involved shooting was protected speech on a matter of public concern. 561 F.3d at 269. Cartwright alleges no facts to suggest that his speech concerned anything other than his effort to address an employment dispute during which he threatened to resign and admitted to refusing to follow a directive from his superior officer. He has not presented a plausible analogy between his dispute over whether he was fairly suspended for disobeying orders and a public investigation into a police shooting.

Cartwright fails to allege facts showing that his statements before or during the hearing addressed a matter of public concern. Instead, his allegations demonstrate that his speech was oriented exclusively toward resolving a personal employment grievance. For this reason, his speech was not protected by the First Amendment. Therefore, the undersigned recommends that the court grant Creque's Motion to Dismiss Cartwright's First Amendment retaliation claim based on freedom of speech.

### 2. Sawyer

Sawyer's free speech retaliation claim is based upon the premise that Creque disciplined him for speaking with Councilperson Nixon about the limitations on his ability to work for his wife or others on his own time. However, the "content, form, and context" of Sawyer's alleged speech demonstrate that he did not complain about the policy *as a citizen* concerned that it

worked an injustice of public concern, but spoke as an employee aggrieved by the policy's implications for his own interests. His allegations show that he: (1) approached Nixon after Creque chastised him for violating the outside employment policy; (2) approached Nixon privately, not during a Town Council meeting; and (3) followed-up with her because he had not heard from Creque personally about the status of the disciplinary action against him. Taken together, these allegations demonstrate that Sawyer approached an elected representative with a private employment dispute in the hope that she would intercede on his behalf.

This conclusion is bolstered by Sawyer's allegation that he contacted Nixon by phone eight days after his in-person conversation with her "because [he] had not heard anything from Creque" in the ongoing dispute over Sawyer's outside employment. *Id.* ¶ 64. This allegation suggests that Sawyer did not approach Nixon so that she "might, at some point in the future, seek to amend" the policy for the benefit of all employees. *See id.* ¶ 63. To the contrary, Sawyer's impatience to hear something from Creque directly suggests that his principal interest was to have Nixon push Creque to change the way the policy was applied to Sawyer individually.

Accordingly, Sawyer has failed to establish that his speech was related to a matter of public concern. For this reason, the undersigned recommends that the court grant Defendant Creque's Motion to Dismiss Sawyer's First Amendment retaliation claim based on freedom of speech.

### B. First Amendment Retaliation for Petitioning for the Redress of Grievances

Plaintiffs next allege that their terminations violated their First Amendment right to petition the government for the redress of grievances. Cartwright asserts that Creque violated his rights under the Petition Clause because he terminated Cartwright in retaliation for retaining counsel to help him challenge his two day suspension. Compl. ¶ 83, D.E. 1. Plaintiff's

Response to Creque's Motion to Dismiss, however, does not pursue this argument, but, instead, claims that Cartwright was terminated because he spoke out against what he perceived as baseless allegations supporting his two-day suspension. Pl. Resp. at 4-5, D.E. 44. Sawyer maintains, both in the Complaint and his Response, that Creque violated his rights by terminating him for speaking with Nixon about the employment policy. *Id.* Creque argues that neither Plaintiff alleges that he was petitioning the government for the redress of a problem of public concern. *See* Def. Mem. in Supp. at 18-19, D.E. 17.

The First Amendment, made applicable to the states through the Fourteenth Amendment, provides that Congress shall make no law abridging the right of the people "to petition the government for a redress of grievances." U.S. Const. am. I. As the Supreme Court noted in *Borough of Duryea, Pa. v. Guarnieri*, "the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." 131 S. Ct. 2488, 2494 (2011). In *Guarnieri*, the Court did not consider the proper application of the Petition Clause beyond the context of a public employee's access to the courts. *Id.* The Court recognized, however, that Petition Clause claims must be analyzed according to the "objectives and aspirations that underlie the right," including allowing citizens to express their concerns to their elected representatives. *Id.* at 2495.

Nevertheless, the protections afforded by this clause are not unlimited: "Unrestrained application of the Petition Clause in the context of government employment would subject a wide range of government operations to invasive judicial superintendence." *Id.* at 2496. Government employees cannot constitutionalize their private employment disputes merely by filing a lawsuit or engaging in some other act of appealing to the government. *See id.* at 2496-97. For this reason, the Supreme Court cited approvingly the rule in *Connick* and the Fourth

Circuit's opinion in *Kirby*, which required an employee's petition claim to meet the same public concern requirement involved in First Amendment retaliation claims based on speech. *Id.* at 2493, 2495, 2497.

While petition claims, like free speech claims, are generally viable only if the petition at issue involves a matter of public concern, *Kirby*, 388 F. 3d at 448–49, the Fourth Circuit Court of Appeals has recognized a limited exception to this rule for cases of secondary retaliation. Secondary retaliation analysis focuses on the uncommon situation in which 1) a plaintiff has suffered a negative employment action because of some expressive act, and 2) suffers a second negative employment action after he files or threatens to file a lawsuit challenging the first negative employment action. *See Andrew*, 561 F.3d at 269.

Under a theory of secondary retaliation, the plaintiff may be able to state a petition claim related to the second negative employment action after he filed a grievance or lawsuit *even if* the court determines that the speech that provoked the first negative action was private and unprotected. *See id.* (discussing *Kirby*, 388 F.3d at 449). In such cases, the court's focus is on the broader implications of the second allegedly retaliatory action rather than the discrete dispute giving rise to the first. *See id.* (discussing the public interest in protecting police officers' right to file lawsuits that might reveal police officials' wrongdoing). In *Kirby*, the Fourth Circuit reversed the lower court's grant of summary judgment against a police officer's petition claim because the officer's second-level demotion for filing a lawsuit challenging his first-level reprimand was a matter of public concern. 388 F.3d at 449-450. In *Andrew*, the Fourth Circuit overturned the dismissal of a police officer's petition claim because his second-level termination for threatening to file a lawsuit to challenge his first-level exposure to an internal affairs investigation presented a matter of public concern. 561 F.3d at 269.

14

Creque and Sawyer rely on the cases establishing the secondary relation doctrine to support their argument that their claims should survive Creque's Motion to Dismiss. Cartwright argues that his termination after challenging his two-day suspension was a matter of public concern because it could have a "chilling effect" on other officers' willingness to challenge disciplinary actions taken against them. Pl. Resp. at 4, D.E. 44 (discussing *Kirby*, 388 F.3d at 449-50). Sawyer argues that his termination after speaking to Nixon involved a matter of public concern because he asked her to change a policy that restrained "public servants from serving the public in their free time without compensation." *Id.* at 8.

However, as explained in further detail below, the problem confronting both Cartwright and Sawyer's efforts to use a secondary retaliation theory to support their petition claims is that neither has alleged they were subject to two levels of negative employment actions. In each case, the Plaintiffs were subject to a single allegedly retaliatory action. For this reason, the viability of their claims depends on whether their petitions addressed a matter of public concern. As the court has already resolved this question against Plaintiffs, their petition claims must be dismissed.

1.     **Cartwright**

Cartwright alleges that Creque violated his First Amendment rights by retaliating against him for challenging his suspension. He does not allege that he was subject to an earlier act of discipline for protected expression that could lead the court to consider his termination an act of secondary retaliation. Cartwright's petition claim must therefore be assessed in the same way as his free speech retaliation claim– his petition is only protected if it addresses a matter of public concern. *See Guarnieri*, 131 S. Ct. at 2500-01. For the reasons noted above, Cartwright's appeal of Captain Williams's decision was not protected by the First Amendment because it concerned a

private employment dispute over whether Cartwright was fairly disciplined for his admitted insubordination.

If the content of Cartwright's petition demonstrates the personal, unprotected nature of his petition, so too does its form. As the Supreme Court noted in *Guarnieri*, "[a] petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context. *Id.* at 2502. Here, Cartwright's petition was part of his effort to appeal his suspension through the police department's internal grievance procedures. Speaking to the government in one's capacity as a government employee is not a First Amendment petition because such conduct has no relevant analogue to the petitionary speech by citizens who are not government employees. *See Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006).

To determine that Cartwright's petition for a hearing on his two day suspension for insubordination is protected by the First Amendment would cause problems with "invasive judicial superintendence" over employee grievances regarding "working conditions, pay, discipline, promotions, leave, vacations, and terminations" that the Supreme Court cautioned against in *Guarnieri*. 131 S. Ct. at 2496. Fair or not, Cartwright's termination in the wake of a hearing in which he admitted to multiple acts of insubordination does not raise a cognizable claim of retaliation under the Petition Clause.

Cartwright failed to allege facts showing he was subjected to secondary retaliation or that he was retaliated against for petitioning for a redress of grievances on a matter of public concern. Therefore, he cannot maintain a claim under the First Amendment and the undersigned recommends that the district court dismiss Cartwright's claim of retaliation under the Petition Clause.

## 2.     Sawyer

Like Cartwright, Sawyer fails to articulate how his termination was a matter of secondary retaliation at all.  The Complaint shows that Sawyer was subject to a single negative employment action – his termination after speaking to Nixon.  All of the preceding disciplinary actions taken against Sawyer concerned his violations of the outside employment policy, not any speech or petitioning he happened to engage in.  Accordingly, Sawyer's petition claim is analyzed in the same manner as his claim for retaliation based on free speech: it can only survive dismissal if Sawyer sufficiently alleges that his discussions with Councilperson Nixon concerned a matter of public concern.  *See Guarnieri*, 131 S. Ct. at 2496-2497.

As discussed above, the "content, form, and context" of Sawyer's alleged petition show that he approached Nixon about a private employment matter, not a matter of public concern.  Therefore, the undersigned recommends that the court grant Creque's Motion to Dismiss Sawyer's First Amendment retaliation claim based on the Petition Clause.

## 3.     Creque's Qualified Immunity

Even if the court were to determine that Cartwright or Sawyer have stated a claim under the Petition Clause, Creque would be entitled to qualified immunity.  *See* Def. Mem. in Supp. at 2, D.E. 39.  Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).   "When determining whether a reasonable officer would have been aware of a constitutional right, we do not impose on the official a duty to sort out conflicting decisions or to resolve subtle or open issues."  *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998).  Furthermore, the clearly defined law of which a

reasonable officer would have been aware must be defined specifically, not at a high level of generality. *City & Cnty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1776 (2015) (citations omitted). This act of specifically defining the relevant law is particularly nuanced in First Amendment cases, where courts must engage in a sophisticated balancing of interests to determine whether a plaintiff's rights have been violated, and "only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected." *McVey*, 157 F.3d at 277 (citations omitted).

Here, Plaintiffs attempt to support their petition claims by citing the secondary retaliation jurisprudence of *Kirby* and *Andrew*. Even if these cases were to apply – and, for the reasons noted above, they do not – Plaintiffs would not be able to demonstrate that Creque ran afoul of "clearly established law" as required to overcome the defense of qualified immunity. In *Kirby*, the court described its secondary retaliation ruling as a close call and went on to dismiss the officer's claim based on qualified immunity. 388 F.3d at 450. In *Andrew*, the court did not address the issue of qualified immunity, but the decision upholds a petition claim on the basis of facts – a threat to sue in the midst of a dispute over leaking information to the media in a public investigation – that are clearly different than the ones supporting Plaintiffs' claims. *See* 561 F.3d at 264. These Fourth Circuit decisions are tied to uncommon fact patterns with a "close and somewhat confusing relationship between the retaliation claims of different levels." *See Kirby*, 388 F.3d at 449. Each case turns on a nuanced determination that a threat to sue can be a matter of public concern even when the original dispute involves a personal employment matter unprotected by the First Amendment.

Insofar as Plaintiffs have failed to allege two-level retaliation, however, the *Kirby* and *Andrew* decisions simply do not apply. Furthermore, Plaintiffs have failed to put forward any

18

case law – much less clearly established case law – that grants protected status under the Petition Clause to either (1) a government employee's use of an internal grievance hearing to contest the reasons for his suspension for insubordination and other misconduct, or (2) an employee's discussion of an outside employment policy with an elected representative in a private setting. Because Plaintiffs have failed to produce a case with even remotely analogous facts to the ones alleged in the Complaint, they have failed to produce grounds for denying Creque qualified immunity in this case.

For this reason, therefore, the undersigned recommends that the court grant Creque's Motion to Dismiss Plaintiffs' First Amendment retaliation claim based on the Petition Clause.

### D.  Denial of Equal Protection of the Laws

Finally, Sawyer alleges that Creque violated his right under the Fourteenth Amendment's Equal Protection Clause by applying the Town's outside employment to him, but not other similarly situated employees.[8]  "[A] plaintiff can make an Equal Protection claim as a 'class of one' if the plaintiff alleges that '[he] had been intentionally treated differently from others similarly situated and that there was no rational basis to support the different treatment.'" *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach,* 420 F.3d 322, 328 (4th Cir. 2005) (citations omitted).  The "class of one" theory, however, is a "poor fit" in the public employment context, where employment is at will and subject to broad discretion.  *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 605 (2008).  Therefore, "the class-of-one theory of equal protection has no application in the public employment context."  *Id.* at 607.

Sawyer was a public employee of the Town police department.  Compl. ¶ 8, D.E. 1.  The Complaint does not identify him, for Equal Protection Clause purposes, as a member of any

---

[8] As noted above, Cartwright has abandoned his equal protection claim.  Pl. Resp. at 1, D.E. 44.  Therefore, the undersigned recommends that Cartwright's equal protection claim be dismissed.

protected class. The only available theory of Sawyer's equal protection claim, therefore, is that he was a "class of one," treated differently from other employees without a rational basis for this treatment. Because the class of one theory does not apply in the public employment context, however, Sawyer's equal protection claim must be dismissed.

Accordingly, the undersigned recommends that the court grant Creque's Motion to Dismiss on the issue of equal protection.

## IV. Conclusion

For the foregoing reasons, the undersigned recommends that the court grant Creque's Motion to Dismiss (D.E. 38).

The Clerk is ordered to send a copy of this Memorandum and Recommendation to Plaintiffs. They shall have until 14 days after service of the Memorandum and Recommendation to file written objections. The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If Plaintiffs do not file written objections to the Memorandum and Recommendation by the foregoing deadline, they will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, their failure to file written**

**objections by the foregoing deadline will bar them from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins***, 766 F.2d 841, 846-47 (4th Cir. 1985).**

Dated: July 20, 2015

ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE