IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:14-CV-39-FL

| | |
|---|---|
| ROBERT CARTWRIGHT and DENISE O. SAWYER, Administratrix of the Estate of Jonathan Sawyer, III, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ORDER ) |
| TOWN OF PLYMOUTH, NORTH CAROLINA; KENNETH CREQUE; and JOANNE FLOYD[1] | ) ) ) ) |
| Defendants. | ) |

This matter is before the court on motion to dismiss by defendant Kenneth Creque ("Creque"), pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 38). Pursuant to 28 U.S.C. § 636(b)(1)(B), United States Magistrate Judge Robert T. Numbers, II, entered memorandum and recommendation ("M&R"), wherein it is recommended that the motion to dismiss be granted. Plaintiffs filed objections to the M&R,[2] and defendant Creque responded. In this posture, the issues raised are ripe for ruling. For the following reasons, the court adopts the M&R and grants the motion to dismiss.

---

[1] Plaintiffs' action against defendants Town of Plymouth ("Plymouth") and Joanne Floyd ("Floyd") was dismissed for failure to state a claim on March 26, 2015. (DE 53).

[2] On March 17, 2015, the court granted plaintiffs' motion to substitute original plaintiff Jonathan Sawyer, III, who died November 24, 2014, with his wife, Denise O. Sawyer, as administratrix of the estate of Jonathan Sawyer, III. The court has amended the caption of this case to reflect the substitution.

## BACKGROUND

Plaintiff Robert Cartwright ("Cartwright") and substituted-plaintiff Jonathan Sawyer, III ("Sawyer"), both former police officers with the Plymouth Police Department, commenced this action on June 29, 2014, against defendant Plymouth; defendant Kenneth Creque, in his personal capacity as former Town Manager of Plymouth; and defendant Floyd, in her official capacity as current Town Manager of Plymouth. Plaintiffs assert that defendants violated their federal constitutional rights in the course of disciplining them and terminating their employment with the Plymouth Police Department. Plaintiffs assert two claims: (1) retaliation for exercise of First Amendment right of freedom of speech, in violation of 42 U.S.C. § 1983, and (2) retaliation for exercise of First Amendment right to petition for redress of grievances, in violation of 42 U.S.C. § 1983.[3] Plaintiff Sawyer also alleges that defendant Creque denied Sawyer equal protection under the law, in violation of 42 U.S.C. § 1983, by selectively applying a Town of Plymouth policy barring outside employment for police department personnel.[4]

On August 25, 2014, defendants Floyd and Plymouth filed a motion to dismiss all claims against them for failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6). On November 10, 2014, defendant Creque filed a motion to dismiss for failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6).

The court stayed scheduling activities in the case pending outcome of the motions to dismiss. The court referred the motions to dismiss to the magistrate judge. In an M&R dated February 9,

---

[3] A fourth claim against defendant Plymouth for violation of North Carolina public policy was dismissed by this court in a previous order, as noted below. (DE 53). Plaintiffs voluntarily dismissed a fifth claim for violation of the Fair Labor Standards Act prior to filing of the instant motion to dismiss. (See DE 13).

[4] Initially both plaintiffs raised equal protection claims. Cartwright, however, subsequently abandoned his claim on December 31, 2014. (Pl. Resp. to Motion to Dismiss, DE 44).

2015, the magistrate judge recommended the court dismiss all claims against defendants Floyd and Plymouth, on the basis that plaintiffs had not alleged that the alleged constitutional violations were the result of an official policy or custom of Plymouth. (DE 47). In addition, it was recommended that the court dismiss the wrongful discharge claim against Plymouth because plaintiffs failed to identify a North Carolina statutory or constitutional provision that was violated by their termination. On March 26, 2015, the court adopted the M&R, and granted defendant Plymouth and defendant Floyd's motion to dismiss. On July 21, 2015, the magistrate judge issued an M&R recommending dismissal of all claims against defendant Creque, for failure to state a claim. Plaintiffs filed objections on August 4, 2015, and defendant responded to these objections on August 21, 2015.

## STATEMENT OF FACTS

The court adopts and incorporates in large part herein the summary statement of facts set forth in the M&R and the court's prior order of dismissal.

    A.    Factual Allegations Relevant to Cartwright's Termination

On April 14, 2012, Cartwright was involved in two investigations: one involving a female subject detained by a Tyrell County deputy sheriff for allegedly stealing property from a business within the Town's jurisdiction and a breaking and entering ("B&E") at a Town residence. (Compl. at ¶¶ 9-14, DE 1). In the first investigation, Cartwright did not arrest the female subject. He allowed her to remain in the custody of the deputy sheriff who then charged her with possession of stolen goods and transported her to jail. (Id. at ¶¶ 11-12).

In the second investigation, Cartwright responded to the B&E call with his partner, Officer Muhammad. Officer Muhammad apprehended the alleged perpetrator of the crime several hours later, but Cartwright transported the suspect to the police department. (Id. at ¶¶ 14-16). Officer

3

Muhammad filed the police report on the B&E incident in the computerized reporting system ("Police-Pak"). (Id. at ¶ 19).

When writing the Police-Pak report, Officer Muhammad mistakenly transposed the names of the victims and witnesses. (Id.). Later that morning, when both Cartwright and Muahmmad were headed home after their shifts, Captain Williams of the Town police department called Cartwright and told him "that either [he] or Muhammad need[ed] to return to the [police department] to correct the B&E report." (Id. at ¶ 27). Cartwright attempted to get Muhammad to return to the department to correct the report, but was unable to reach him. (Id. at ¶ 28).

Cartwright then called Investigator Peal, another officer in the police department, and substituted-plaintiff Sawyer, who was Cartwright's immediate supervisor but who was home on leave at the time, to "express unhappiness with the idea he would have to return to [the police department]" and confirm what he regarded as standard practice with respect to correcting such reports. (Id. at ¶¶ 29-31). Sawyer agreed to correct the Police-Pak report on Cartwright's behalf. (Id. at ¶¶ 35, 37).

Cartwright did not return to the police department. Rather, he called Investigator Peal to state that Sawyer had corrected the report. (Id. at ¶ 38). Peal then stated that Officer Muhammad would need to return to the department. (Id. at ¶ 40). Cartwright did not speak to Captain Williams, but concluded that the captain rescinded his original directive to return to the department because Peal, who was in Captain Williams's presence, said that only Muhammad needed to return. (Id. at ¶ 43). Cartwright did not believe that his failure to return to the police department as directed by Captain Williams was insubordination "as it was not the declination of a request or command as the result of a positive intention to disobey." (Id. at ¶ 45). He suggests that this belief was consistent with the

4

Town's employment policy, which defines "insubordination" as a "[r]efusal to accept a reasonable and proper assignment from and authorized superior." (Id.)

On April 23, 2012, Captain Williams notified Cartwright that he would be suspended for two days without pay. (Id. at ¶ 46). Williams provided four grounds for this suspension: a) inaccurate information entered into the B&E incident report; b) failure to follow the chain of command by contacting Sawyer, who was home on medical leave, rather than other members of the chain; c) insubordination for failure to obey Captain Williams's order to return to the police department to correct the mistaken report; and d) mishandling the investigation of the female subject who allegedly stole property by failing to contact the business owners and make an arrest. (Id.)

Cartwright appealed his suspension to the then-Town Manager, defendant Creque, on April 23, 2012. (Id. at ¶ 47). Creque initially denied Cartwright's appeal by letter dated May 10, 2012. In that letter, he upheld all of the allegations of misconduct presented by Captain Williams. (Id.) Cartwright then requested a hearing on the matter, which Creque granted on May 18, 2012.

After the hearing, defendant Creque upheld the suspension and took the additional action of terminating Cartwright's employment. (Id. at ¶ 52). In his findings in support of his decision, Creque determined that Cartwright had not failed to complete incident documents, to follow the chain of command, or to make an arrest in contravention of departmental policy. Creque found that Cartwright had, however, admitted to willfully refusing to follow a directive from Captain Williams and to threatening to resign during the dispute. (Id. at ¶ 50). He also found that Cartwright refused a directive from his appointed supervisor Investigator Peal. (Id.). Based upon these findings, Creque upheld Cartwright's suspension and took the additional action of terminating his employment. (Id. at ¶ 52). Cartwright claims that he was terminated in retaliation for retaining

5

counsel to challenge the discipline initially imposed by Captain Williams. (Id. at ¶ 83).

The Town's grievance policy governing disputes between employees provides: "Employees subject to this Article shall have the opportunity to be heard without fear of reprisal or retaliation. . . ." (Id. at ¶ 51).

B. Factual Allegations Relevant to Sawyer's Termination

After a period of medical leave, Sawyer sought to return to work with the police department on April 23, 2012 but did not submit the required medical release form. (Id. at ¶ 54). He spent several days negotiating with Captain Williams and the Town's human resources representative about the proper procedure before Williams ordered Sawyer to return to work on April 27, 2012. (Id. at ¶¶ 54-56).

On May 16, 2012, Sawyer attended a meeting with Williams, Chief Steve O'Neal ("Chief O'Neal"), and defendant Creque during which he discussed the dispute over the medical release form. During this meeting, Creque stated that Sawyer had been reported as working for his wife's company in potential violation of the Town's outside employment policy. (Id. at ¶ 58). Sawyer replied that he received no compensation for his work at his wife's business. (Id.). Creque then demanded that Sawyer submit a written request to be able to continue his work in his wife's business, which Sawyer did. (Id. at ¶ 59).

On June 3, 2012, before receiving a reply to his request to continue outside employment, Sawyer was asked by Investigator Peal if he would do a job for a local wrecker company which needed someone to fill-in at the scene of an accident. (Id. at ¶ 60). Sawyer, who had previously worked for a wrecker company, took the job right away. While he was at the scene, Sawyer was photographed by Jennifer O'Neal (the wife of Chief O'Neal), who worked for a competing wrecker

6

company. Ms. O'Neal gave the pictures to Chief O'Neal. (Id. at ¶ 61).

On June 8, 2012, Sawyer received a letter from Creque granting him permission to continue his work with his wife's business under the condition that Sawyer work there only while he was off duty with the police department; that he stay away from the business during duty hours for any reason other than official police business; and that he not "work for, or provide favours [sic] for, friends, or family with their businesses, under any circumstances." (Id. at ¶ 62).

Sawyer contends that other employees with the Town police department had outside employment ranging from working for a funeral home or a gutter business to cleaning cottages at the beach for a realty company. (Id. at ¶ 71). He contends further that these employees were not required to get permission for such employment nor disciplined for having it. (Id.)

After receiving the June 8 letter from defendant Creque, Sawyer approached Town Councilperson Mary Nixon ("Nixon") and showed her the letter from Creque. (Id. at ¶ 63). Sawyer then presented her with two alternate versions of the Town's outside employment policy that he had drafted. (Id.). On June 20, 2012, Sawyer followed-up with Nixon by phone "because [he] had not heard anything from Creque." (Id. at ¶ 64).

On June 21, 2012, Chief O'Neal suspended Sawyer for four days until a pre-disciplinary hearing that would be held on June 25. (Id. at ¶ 65). Chief O'Neal cited four violations of Town policy at this meeting. (Id.) Sawyer was charged with: (1) one count of working at an unreported job, which Sawyer understood to refer to his work for the wrecker company; (2) one count of transmitting confidential information, which Sawyer understood to refer to his entry of a correction to Officer Muhammad's Police-Pak report discussed above; (3) one count of employee harassment, which Sawyer understood to refer to Creque's perception that Sawyer's discussion with Nixon was

7

an effort to coerce Creque into changing his position expressed in the letter from June 8; and (4) two counts of insubordination, which Sawyer understood to refer to violations of Creque's "announcement that Town employees were not permitted to talk to Town councilmembers concerning any administrative policy or policies." (Id. at ¶ 67).

At a meeting on July 20, 2012, defendant Creque and Chief O'Neal terminated Sawyer from his employment with the Town police department. (Id. at ¶ 70).

## COURT'S DISCUSSION

A.   Standard of Review

The district court reviews *de novo* those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). The court does not perform a *de novo* review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir.1992); see also Edwards v. City of Goldsboro, 178 F.3d 231, 243–44 (4th Cir.1999). A complaint states a claim under 12(b)(6) if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

8

its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

"Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating the complaint, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir.2009) (citations omitted).

B.  Analysis

Plaintiffs raise five issues in their objections to the magistrate judge's M&R: (1) that the magistrate judge improperly resolved certain factual issues in making his recommendation; (2) that the magistrate judge incorrectly found the complaint failed to demonstrate plaintiffs' speech in the instant matter addressed matters of public concern; (3) with regards to plaintiffs' Petition Clause claim, that the magistrate judge incorrectly determined that plaintiffs were only subjected to one negative employment action; (4) that the magistrate judge incorrectly found that plaintiffs' Petition Clause claims were not a matter of public concern; (5) and that the magistrate judge improperly determined that defendant was entitled to qualified immunity, regardless of the above findings. (Pl. Obj. to M&R, DE 56).[5] The court will address each objection in turn.

1.  Factual Dispute

Plaintiffs dispute the magistrate judge's determination that plaintiff Cartwright "admitted to

---

[5] The M&R also addressed plaintiff Sawyer's equal protection claim, and plaintiffs have made no objection to these findings.

9

Case 2:14-cv-00039-FL   Document 58   Filed 09/03/15   Page 9 of 19

Creque that he willfully disobeyed two orders from his superiors and threatened to resign during his earlier dispute with them," and "admitted to refusing to follow a directive from his superior officer." (Id. at 2, DE 56, citing to M&R at 9, 11, DE 55). Defendant is the party moving for dismissal, and all factual inferences must indeed be made in favor of the non-movant, plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). The court duly notes that plaintiff Cartwright does not admit to willfully disobeying his superiors, and accepts this fact as true.

2. First Amendment Retaliation as a Result of Free Speech

To advance a § 1983 First Amendment retaliation claim, a plaintiff must establish three elements: (1) that his speech is protected; (2) that defendant's alleged retaliatory action adversely affected plaintiff's constitutionally protected speech; and (3) that a causal relationship exists between plaintiff's speech and defendant's retaliatory action. Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685-86 (4th Cir. 2000). To establish that a public employee's speech is protected by the First Amendment, a plaintiff must show the speech that formed the basis for the alleged retaliatory action is related to a matter of public concern. See Connick v. Myers, 461 U.S. 138, 146 (1983). The Fourth Circuit has conclusively held that "it is settled that a public employee's expression of grievances concerning his own employment is not a matter of public concern." Huang v. Bd. of Governors of Univ. of N. Carolina, 902 F.2d 1134, 1140 (4th Cir. 1990). Whether a public employee's speech implicates a public concern is determined by looking at the content, form, and context of the speech. Id.

If the court determines that an employee's speech is related to a matter of public concern, it must then balance the employee's interest "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public

10

services it performs through its employees." See Connick, 461 U.S. at 142 (internal citation omitted). Finally, to prove the causation prong of the analysis, a plaintiff "must show that 'but for' the protected speech, the employer would not have taken the alleged retaliatory action." Huang, 902 F.2d at 1140.

As set forth below, the court reaches neither the balancing analysis, nor issues of causation, because plaintiffs fail to demonstrate their speech was a matter of public concern.

      a.    Cartwright

Plaintiff Cartwright alleges that his April 23, 2012, written response to the grounds given for his original suspension constitutes speech that implicates a public concern. (Pl. Resp. to Def. Motion to Dismiss at 4, DE 44). Cartwright further contends that he reiterated this speech later at a formal hearing concerning the suspension, and that the substance of said speech caused defendant to "[strike] three of the four grounds that supported the original two-day suspension, but [defendant Creque] used the one remaining ground to terminate Cartwright." Id. Cartwright admits that the substance of this speech "related to a private matter," but claims that a Town Manager's "retaliation against [Cartwright] for challenging baseless allegations that caused him a two-day suspension" implicates a matter of public concern. Id. at 4-5. Plaintiff Sawyer makes a similar argument, as it pertains to his specific facts, outlined infra.

To support the position that his speech implicates a public concern, Cartwright cites Kirby v. City of Elizabeth City, North Carolina, 380 F.3d 440 (4th Cir. 2004), and Andrew v. Clark, 561 F.3d 261 (4th Cir. 2009). In Kirby, a police officer testified truthfully at another officer's official disciplinary hearing about that officer's use of a police department vehicle. Kirby, 380 F.3d at 444. Later, after the hearing, Kirby was orally reprimanded for "[f]ailure to support the Department's

11

Administration." Id. After this reprimand, Kirby filed a grievance challenging the reprimand, and initiating a lawsuit. In response to Kirby's petitions, he was subsequently subjected to a variety of additional retaliatory working conditions, including a demotion, lower pay rate, and assignment to secretarial duties. Id. at 4-5.

In Andrew, a police officer, dissatisfied with his department's handling of a police involved shooting, drafted a memorandum about the shooting that he subsequently provided to the Baltimore Sun newspaper. Andrew, 561 F.3d at 264. When an article quoting Andrew's memorandum was published, the police department charged Andrew with giving confidential information to the media, demoted him to a less desirable position, demanded he retire, and provided him with paid time off. Id. at 265. After Andrew refused retirement, and returned to work, his compensation and benefits were terminated. Id. Because Andrew continued to work without pay, his legal counsel petitioned the police department and the city solicitor for redress, informing them Andrew intended to bring a lawsuit. Id. The police department subsequently terminated Andrew's employment entirely. Id.

Cartwright's reliance on these cases to prove his speech implicated a public concern is mistaken, however. The court in Kirby divided plaintiff's claims on appeal into separate categories for analysis: (1) a "first-level" retaliation analysis for speech, and (2) a "second-level" retaliation analysis based on plaintiff's petition for redress of grievances resulting from the alleged retaliation committed at the first-level. Kirby, 380 F.3d at 449. The court did so because the case presented "the uncommon allegation of second-level retaliation." Id. The first-level of inquiry, the threshold question of whether the substance of the speech implicates a matter of public concern, is taken directly from our established case law. See Connick, 461 U.S. at 142. Plaintiff is only entitled to the multi-tiered analysis if he produces evidence indicative of secondary retaliation. See Kirby, 380

12

F.3d at 449. This court will save for discussion infra the question of whether the claims presented by plaintiffs at bar actually implicate that second-level of retaliation, and instead begin with the traditional first-level analysis.

The court in Andrew also engaged in a multi-leveled speech and petition analysis, citing to Kirby. Andrew, 561 F.3d at 269. At the first-level, the Fourth Circuit in Andrew did not make the factual determination as to whether the speech implicated a matter of public concern. Id. 268. Because the district court erred procedurally, the district court granted defendants' motion to dismiss without ever considering whether the substance of the speech, circumstances surrounding a police-involved shooting, factually implicated a matter of public concern. Id. The Fourth Circuit, upon receiving the case on appeal, overturned the district court for failing to apply the Connick inquiry correctly, and remanded the issue for resolution by the district court. Id. 268. As a result, Andrew is inapplicable at this stage of the analysis.

Further, plaintiff Cartwright admits that the contents of his April 23, 2012 written response and his testimony at the later hearing "related to a private matter," specifically, whether his two-day suspension was "baseless" (Pl. Resp. to Def. Motion to Dismiss at 4-5, DE 44), although plaintiffs now claim not to concede this point. (Pl. Obj. to M&R at 5, DE 56). The alleged retaliatory action, Creque firing Cartwright after the hearing, was based on speech pertaining to a private matter, a grievance over the grounds upon which he was suspended, just as the first-level of retaliation in Kirby was based on speech, the testimony about the vehicle, that "did not involve a matter of public concern." Kirby, 380 F.3d at 450. The content of Cartwright's speech was his own employment grievance; the context and form were within the confines of a department employee disciplinary hearing. As a result, plaintiff Cartwright's speech claims fail the first-level of analysis.

13

b.  Sawyer

Plaintiff Sawyer argues that his speech against defendant Creque's policy prohibiting police officers from working outside jobs implicates a public concern because it placed limits on what employees did in their free time. (Pl. Resp. to Def. Motion to Dismiss at 7, DE 44). Sawyer was suspended for four days after approaching Nixon and Creque, and was then terminated by Creque one month after the suspension. (Compl. at ¶¶ 64-70, DE 1). For the reasons state above, Andrew is not applicable at this level of analysis. Kirby is also of limited relevance, since the first-level of analysis is a fact-specific question. To survive a motion to dismiss, plaintiff needs to provide more than "bare assertions devoid of further factual enhancement," Nemet Chevrolet, Ltd., 591 F.3d at 255, and Sawyer has pleaded no facts as to how a limitation placed on an employee's ability to hold a second job would interest the public. The public nature of such a policy is not, as plaintiffs claim, "beyond doubt." (Pl. Resp. to Def. Motion to Dismiss at 8, DE 44). Absent facts as to how such an employment policy interests the public, the court finds Sawyer's speech to be substantively nothing more than a public employee's expression of grievances involving conditions of employment. Huang, 902 F.2d at 1140. Like plaintiff Cartwright's claims, plaintiff Sawyer's first level speech claims also fail to implicate matters of public concern at the first level of analysis.

In sum, plaintiffs' First Amendment Speech claims are without merit as they fail to implicate matters of public concern.

3.  First Amendment Retaliation for Petitioning for the Redress of Grievances

An employee's petition claim under the First Amendment must also implicate matters of public concern, because to hold otherwise would "subject a wide range of government operations to invasive judicial superintendence." Borough of Duryea, Pa. v. Guarnieri, 131 S. Ct. 2488, 2496

(2011). Plaintiffs' petitions and their speech are one in the same substantively: Cartwright alleges the issuance of his April 23, 2012, written response to suspension and his testimony at the hearing regarding the grounds for his suspension constituted his petition for redress, and Sawyer alleges his conversations with Nixon on June 8 and June 20th, as well as his attempts to negotiate with Creque about the policy constituted his petitions for redress. Both plaintiffs argue then that they were punished for the content of their speech, as well as its petition nature. For the reasons given in the court's speech analysis, plaintiffs' petition claims, like their speech claims, also do not implicate matters of public concern based purely on a first-level analysis.

Plaintiffs allege that they suffered secondary retaliation, however, and that the Kirby second-level of analysis renders their petitions matters of public concern. It is at this stage that the court will take up the tiered framework of Kirby. Kirby alleged that his supervisors retaliated against him based on his testimony as a factual witness at the grievance hearing of another officer. Id. at 443. Kirby's employer first retaliated against him by issuing an oral reprimand based on the content of his speech; the second adverse employment action occurred after he filed his own grievance challenging the punishment and initiating suit. Kirby, 388 F.3d at 444. The Fourth Circuit held that within the peculiar subset of cases involving second-level retaliation, a petition that would otherwise not implicate a matter of public concern based on the content of the grievance may be considered of public concern, if it pertains to the neutral testimony of a witness officer at a hearing. Id. at 449-50. The policy behind such a conclusion was to encourage officers to provide truthful testimony in hearings as "[an] allegedly unwarranted reprimand could have a significant chilling effect on testimony relating to matters of public as well as private concern." Id. at 450. The possibility of discipline "constitute[s] a form of implied pressure" on witness officers, who subsequently will be

15

less likely to volunteer to participate any form of hearing, including those that may implicate matters of public concern. Id.

        a.    Cartwright

Cartwright does not allege that his initial suspension was based on protected speech. Cartwright alleges the grounds given for his initial suspension were a) inaccurate information entered into the B&E incident report; b) failure to follow the chain of command by contacting Sawyer, who was home on medical leave, rather than other members of the chain; c) insubordination for failure to obey Captain Williams's order to return to the police department to correct the mistaken report; and d) mishandling the investigation of the female subject who allegedly stole property by failing to contact the business owners and make an arrest. (Compl. at ¶¶ 46, DE 1). The court takes note that Cartwright disputes these grounds as "baseless." (Pl. Resp. to Def. Motion to Dismiss at 4-5, DE 44).

In any event, no facts alleged support an inference that Cartwright's initial suspension was retaliatory for speech or any form of petition. Cartwright does not claim that protected speech generated this initial negative employment action, the two-day suspension, but rather, that his suspension resulted from a misunderstanding about whether he willfully disobeyed his superiors. Plaintiffs reiterated the facts surrounding this misunderstanding in a specific objection to the M&R. (Pl. Obj. to M&R at 2, DE 56). After Cartwright submitted his April 23, 2012, grievance and testified at his own disciplinary hearing, Cartwright was only then subjected to one negative employment action: he was terminated sometime after his May 2012 hearing. (Compl. at ¶¶ 52, DE 1).

As a result, because his suspension was not for speech or a form of petition, Cartwright

cannot invoke the secondary retaliation framework of Kirby, and the court's first-level determination that his petition did not involve a matter of public concern stands. Cartwright's First Amendment claims all fail for failure to implicate a public concern, and must be dismissed for failure to state a claim upon which relief can be granted.

        b.      Sawyer

Sawyer alleges the first negative employment action imposed upon him by Creque was the limitation on working for family and friends. (Pl. Obj. to M&R at 3, DE 56) Sawyer has pleaded no facts as to why Creque imposed such a condition upon Sawyer, and Sawyer does not allege that the limitation was retaliation for any First Amendment based reason. In retaliation for petitioning Nixon and Creque about the no-work policy, Sawyer was only subject to what may accurately be called one negative employment action. Sawyer was suspended on June 21, 2012, and subsequently terminated based on the same grounds, approaching Nixon, on July 20, 2012. (Pl. Obj. to M&R at 4, DE 56). Sawyer has not pleaded any intervening facts that would make the subsequent termination a secondary retaliation. In conclusion, Sawyer has only alleged one post-speech/petition negative employment action, and thus, cannot invoke the secondary retaliation framework of Kirby. See Kirby, 388 F.3d at 444. Sawyer's claims, like Cartwright's, subsequently do not implicate matters of public concern, and must be dismissed for failing to state a claim.

        4.      Qualified Immunity

Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The United State Supreme Court has "repeatedly told

17

courts...not to define clearly established law at a high level of generality." City & Cnty. of San Francisco, Calif. v. Sheehan, 135 S. Ct. 1765, 1776 (2015).  Broadening the definition of clearly established law would make qualified immunity "no immunity at all."  Id.  In Kirby, the court dismissed plaintiff's claims on the basis of qualified immunity, as:

> "...the petition rights that Kirby alleges...are anything but clear. As is apparent from our analysis of the petition claim, the legal viability of the claim presents a close and novel issue, and even assuming that Kirby's allegations are true, [defendants] cannot be held liable for what would amount to 'bad guesses in [a] gray area [].'"

Kirby, 388 F.3d at 450-51 (internal citations omitted).

Even if the court were willing to consider plaintiffs' speech a matter of public concern, this would be an extension of Kirby beyond the contemplation of defendant at the time of the alleged conduct.  Assuming that defendant was aware of the bounds established by the court in Kirby, the Fourth Circuit there established only that truthful, impartial law enforcement testimony at hearings should be encouraged, and that retaliating against a witness officer for providing truthful testimony in a matter, regardless of the nature of the hearing, would henceforth no longer be grounds for qualified immunity.  See, generally, Kirby, 388 F.3d at 449-50.

Here, plaintiffs, unlike Kirby, testified only on their own behalf, and not as disinterested witnesses.  Plaintiffs were less susceptible to the pressures the Fourth Circuit was concerned about in drafting Kirby, because plaintiffs were motivated by self-interest.  "When determining whether a reasonable officer would have been aware of a constitutional right, we do not impose on the official a duty to sort out conflicting decisions or to resolve subtle or open issues." McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998).  The court in Kirby addressed protection of impartial witness officer testimony only, and as a result, defendant cannot be held responsible for any further extension beyond that narrow scope.

18

In sum, plaintiffs' pleadings do not demonstrate a violation of clearly established law, and as a result, defendant Creque is entitled to dismissal based on qualified immunity, in addition to dismissal based on the court's determinations above.

5. Denial of Equal Protection of the Law

Plaintiffs raise no objection to the magistrate judge's recommendation of dismissal regarding plaintiff Sawyer's equal protection claim, and as a result, the court reviews that portion of the M&R for clear error only. The M&R is well-reasoned with regards to this claim, and the court fully adopts that reasoning here. "[T]he class-of-one theory of equal protection has no application in the public employment context." Engquist v. Oregon Dep't of Agr., 553 U.S. 591, 605 (2008). Plaintiff Sawyer's equal protection claim is dismissed.[6]

## CONCLUSION

Based on the foregoing, upon de novo review of the objections raised, the court ADOPTS the M&R, and the motion to dismiss by defendant Creque (DE 38) is GRANTED. The clerk is directed to close this case.

SO ORDERED, this the 3rd day of September, 2015.

LOUISE W. FLANAGAN
United States District Judge

---

[6] Plaintiff Cartwright, as noted previously, abandoned his equal protection claim prior to the issuance of the M&R. (Pl. Resp. to Motion to Dismiss, DE 44). In any event, for the reasons set forth above it is also dismissed.